UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERESA LANDOSKY,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.
_____/

Case No. 04-74503

JUDGE CORBETT O'MEARA
MAGISTRATE JUDGE STEVEN D. PEPE

**REPORT AND RECOMMENDATION**

**I.**    **Background**

Teresa Landosky brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits under Title II of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be DENIED and Defendant's motion for summary judgment be GRANTED.

    **A.**    **Procedural History**

This is an action by the Plaintiff, Theresa Landosky, seeking judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB). See 42 U.S.C. §§ 416(I), 423(d).

Plaintiff applied for DIB on January 10, 2002, alleging that she had became disabled on July 31, 2001 due to limited use of her shoulders, arms, elbows, wrists, and hand (R. 45-47). Plaintiff's application was denied initially, and following a hearing before Administrative Law Judge

Douglas N. Jones (ALJ) (R. 28-32, 12-22). The Appeals Council denied Plaintiff's request for review ( R. 4-6).

**B.     Background Facts**

  *1.     Plaintiff's Testimony*

On February 9, 2004, Plaintiff appeared with counsel and testified before ALJ Douglas N. Jones. Plaintiff testified that she was born on February 25, 1959, was 5'4" tall, weighed 152 pounds and lived with her husband (R. 261-262). Plaintiff finished high school in 1977 and was last employed at Dow Chemical in July, 2001 (R. 262).

Plaintiff testified that she drove a car five to six days per week to visit her mother, and that she took two trips to Florida in the past two years (R. 264-266), but that she traveled out-of-town less now (R. 83). Plaintiff attended church twice a week (R. 268).

Plaintiff testified that she took Neurontin at night because it "makes you dizzy.... and drowsy...." and that Bextra sometimes made her stomach upset (R. 267-68). Plaintiff took care of her personal needs without assistance (R. 82).

Plaintiff went grocery shopping with her husband because she had difficulty handling the cart and lifting the "canned goods or milks and stuff" (R. 82, 268). Plaintiff cooked, washed dishes, and cleaned laundry (R. 82). Plaintiff explained that she could do some housework but that her husband helped out a lot  (R. 269). Plaintiff stated specifically that her husband had to do the vacuuming and carry the laundry baskets down to the laundry room (R. 269).

Plaintiff testified that it was difficult for her to sleep at night due to discomfort with her left side, which caused her to wake up during the night (R. 269-70). Plaintiff stated that she tried not to nap during the day because it caused her to have headaches and neck pain (R. 270), but then later

testified that she laid down twice a each day for 15-20 minutes (R. 271).

Plaintiff stated that sitting for prolonged periods of time caused her pain in her tailbone and back, and estimated that she could sit for an hour or two before needing to change position (R. 270). Plaintiff also stated that she could stand for a couple of hours in one spot and could "maybe" walk for one mile (R. 270-71). In her *Claimant Activities Questionnaire*, Plaintiff stated that her impairments have not affected her ability to walk or climb stairs (R. 81). When asked to estimate how much she could lift, Plaintiff stated that she had difficulty lifting a jug of milk with two hands (R. 271). Plaintiff explained that she had difficulty using her hands and that she dropped things a lot and had trouble peeling vegetables, cutting food or holding a pencil for a long time (R. 271-272). These activities caused pain in her wrists and hands (R. 272). Plaintiff also stated that she could reach if she did not have to reach too far, and that any "pulling action" irritates her elbows (R. 272).

Plaintiff has no hobbies and engages in no activities and claims that she could only read for short periods of time due to an inability to maintain focus and lack of memory (R. 273).

Plaintiff stated that she still performed home physical therapy exercises (arm exercises, arm stretches and neck stretches), but no longer wore wrist braces because they were designed to take pressure off her wrists and in doing so put too much pressure on her elbows which aggravates the cubital tunnel syndrome in her elbows (R. 274-275). Plaintiff explained that she was told that surgery would alleviate the problems with her hands (R. 275) and that the doctor never suggested surgery for the partial rotator cuff tear of her left shoulder (R. 276).

### C.  Medical Evidence

In June 2000, Plaintiff presented to her doctor complaining of bilateral elbow pain lasting six weeks (R. 91). She had been wearing carpal tunnel braces during the evenings with good

results for the symptoms in her wrists and thumbs, but stopped using them when she began experiencing pain in her elbow. Upon examination, Plaintiff appeared to have lower arm tendinitis (R. 91). Plaintiff was prescribed Vioxx and advised to control pain with heat and ice and to perform stretching exercises (R. 91). One month later, Plaintiff called her doctor stating that Vioxx was not working and that pain was radiating up arm and into shoulder blade with intermittent tingling in left pinky (R. 90). Upon examination four days later, Plaintiff's arms showed full range of motion and excellent pulse, with no swelling or inflammation (R. 90). Her Tinel's testing was negative, her physician recommended Alleve for pain and ordered an EMG (R. 90).

In July 2000, Plaintiff reported to Dow Chemical treater, Jim Cronkright, ATC, who recommended that she treat her pain with ice until after she consult with her neurologist (R. 95). In October, Plaintiff returned to Mr. Cronkright several times and he recommended that she continue a program of strengthening and stretching (R. 93-94). In November, Mr. Cronkright reported that Plaintiff felt much better overall with decreased pain everywhere, though she reported a non-painful "popping" sensation under her arm, Plaintiff was advised to continue with strengthening exercises (R. 92). X-ray studies of the cervical spine and bilateral elbows taken during this time were negative (R. 192, 193).

Also in November, Plaintiff was referred to physical medicine and rehabilitation specialist Alexander Iwanow, M.D., who diagnosed cubital tunnel syndrome (R. 227-28). Upon examination, Plaintiff's reflexes were symmetrical and strength in her arms was grossly 4/5. Carpal tunnel testing was negative, although Plaintiff did complain of some right wrist pain with Phalen's maneuver (R. 227). Plaintiff had a positive Tinel's sign (R. 227). Dr. Iwanow felt that therapy would not help Plaintiff's cubital tunnel syndrome and instead recommended a course of

4

Prednisone with Zantac (R. 228). Plaintiff was placed on restrictions to avoid repetitive gripping, sustained holding, typing within pain tolerance and elbow flexion greater than 90 degrees (R. 228, 229).

Electromyogram (EMG) and nerve conduction studies performed in January 2001, showed evidence of low grade cubital tunnel syndrome on the left, but not the right, according to Dr. Iwanow, who reported no significant improvement with Prednisone (R. 225). Neurontin was prescribed and the doctor explained that it may have side effects including sedative effects, dizziness and lightheadedness and Plaintiff's activity restrictions were continued (R. 225). Dr. Iwanow opined that Plaintiff could not perform repetitive or sustained gripping or holding, elbow flexion greater than 90 degrees, lifting more than 10 to 15 pounds, or return to her prior job, but could perform typing activities within her pain limits and tolerances (R. 225). Dr. Iwanow ordered a bone scan to rule out arthritis, trauma-type degenerative fractures or metabolic bone disease (R. 225).

An ultrasound study of Plaintiff's shoulders performed in September 2001 revealed minimal tendinosis on the right, some tendinosis in the left, raising a question of focal tendinosis versus incomplete tear on the left (R. 189). Plaintiff was referred to rheumatologist Harris Weaver, M.D., who concluded that she had cervical and shoulder myofascial pain, as well as "somewhat symptomatic" left shoulder rotator cuff tendinitis (R.202). From a clinical perspective, the previously diagnosed cubital tunnel syndrome seemed to Dr. Weaver to be much improved. In fact, Dr. Weaver found that "flexion testing for cubital tunnel syndrome was actually negative" (R. 202). Both rheumatoid factor and ANA tests were negative. Dr. Weaver opined that Plaintiff had not reached maximum benefit from physical therapy and recommended manual therapy for Plaintiff's

neck and shoulder girdle discomfort (R. 202).

On May 5, 2002, Plaintiff's family doctor (R.273), K.P. Karunakaran, M.D. conducted a gynecological examination, at which Plaintiff complained that her hands were bothering her and that she was dropping things (R. 232-233). On this same day, Dr. Karunakaran filled in a form letter indicating that he felt that Plaintiff was capable of 65 percent "of his/her maximum capacity for sitting, standing, walking, lifting, carrying, handling objects, speaking and traveling" (R. 231). In that same month, Susan M. Shaughnessy, a state agency physician, reviewed the medical evidence and determined that Plaintiff was credible, Plaintiff was impaired by cubital tunnel syndrome and arthritis, and Plaintiff could perform a wide range of jobs with the following exertional limitations: stand/walk/sit for six hours per eight hour day, no repetitive or sustained gripping or holding, lifting no more than 15 pounds occasionally and 10 pounds frequently, limited gross manipulation, and not even moderate exposure to vibration (R.180-85).

June 2002 x-rays showed mild periarticular osteopenia (osteoporosis) in the right wrist, and symmetric mild periarticular osteopenia on the left, as compared to the right (R. 187-88). On examination, Dr. Iwanow observed arm strength of 4/5 within no specific limitation of motion. There was tenderness in the neck and trapezius region (R. 199). Plaintiff complained of pain in the base of her thumbs and wrist area, especially when using her hands. Symptoms suggested a low-grade arthritic process (R. 199).

In December 2002, Dr. Iwanow noted tenderness in Plaintiff's low back, neck and occipitocervical areas (R. 196). Cervical range of motion to either side was about 70 degrees out of 90 degrees. Plaintiff complained of some low-grade groin pain on the left and flexibility was limited. Dr. Iwanow described Plaintiff as stable. In terms of a diagnosis, Dr. Iwanow stated,

"the closest diagnostic category in addition to her cubital tunnel problem is probably fibromyalgia, through CWP (chronic widespread pain ) is another possible group"(R. 196).  Plaintiff had used her medications appropriately and restricted her activity, essentially minimizing her pain.  Dr. Iwanow noted that Plaintiff "continues to be disabled" and "ever time [sic] the patient returns back to work, she usually redevelops significant symptoms in terms of pain..." (R. 196).

In April 2003, Dr. Iwanow completed Met Life's *Hand/Wrist Disorder Supplemental Functional Assessment* form for Plaintiff's insurance company (R. 239-40).  Dr. Iwanow stated that Plaintiff had cubital tunnel syndrome and fibromylagia and recommended that she not return to work (R. 239-40).  In December 2003, Dr. Iwanow twice completed Met Life's *Attending Physician's Statement of Functional Capacity* form for Plaintiff's insurance company (R. 241-43).  Dr. Iwanow stated that Plaintiff had left cubital tunnel syndrome, right rotator cuff tendinitis, left rotator cuff tear, bilateral shoulder pain, and bilateral wrist pain, requiring "severely restricted activity" and indicated that Plaintiff could "never" return to work.

In July 2003, Plaintiff had endometrial thickening with negative endometrial biopsy, chronic left lower quadrant pain, most likely secondary to dysmenorrhea and bilateral ovarian cysts (R. 245).

In December 2003, Plaintiff visited Dr. Iwanow and continued to complain of pain (R. 255).  She reported waking up with pain in her neck and upper shoulder regions.  Cubital tunnel testing was positive for fifth finger numbness.  Dr. Iwanow recommended that Plaintiff maintain her treatment with medication and opined that she was stable.

In February 2004, Dr. Iwanow diagnosed myofascial pain syndrome, bilateral rotator cuff tendinitis with an incomplete tear on the left, wrist pain, probably early arthritis, and cubital

7

tunnel syndrome on the left, electromyogram confirmed (R. 253). He opined that Plaintiff was unemployable because the work restrictions he would have to write for her would far exceed any employer's ability to accept them (R. 253).

### 4. Vocational Evidence

Pauline McEachin, a vocational expert (VE), also testified at Plaintiff's administrative hearing (R. 277). The VE was asked to assume a person of Plaintiff's age, education and work experience, who was able to perform only light work and could only lift 15 pounds with two hands, could lift five pounds with one hand, who could never reach overhead with the dominant left arm, and could engage in frequent but not constant gross or fine manipulation with either arm and would never use vibrating tools and would not perform work that required forceful or sustained gripping or grasping with either hand or constant, repetitive hand movements or wrist movements (R. 277-78). VE McEachin testified that this hypothetical person could not perform Plaintiff's past relevant work, and that the lifting restrictions alone would preclude the past work (R. 278). Yet, the VE identified a number of jobs the hypothetical person could perform: information clerk (1,700 jobs), visual inspector (2,200 jobs), a reduced range of cashier jobs (4,000 jobs), and a reduced range of inspector jobs (5,000 jobs) (R. 278-79). VE McEachin further testified that, if the hypothetical person were limited to occasional gross and fine manipulation, it would not affect the number of information clerk and visual inspector jobs the hypothetical person could perform, but would eliminate the cashier position and reduce the inspector position to 1,000 jobs (R. 279).

VE McEachin testified that if the hypothetical person was further limited to only occasional gripping, grasping, handling and fingering, that person could still perform work as an information clerk and a visual inspector, but could not perform the inspector jobs (R. 280). If the person were

limited to writing rarely, that person could still perform work as a visual inspector (R. 281). VE McEachin also testified, when asked by Plaintiff's counsel, that if the hypothetical person were limited to only occasionally bending, flexing or extending their elbows bilaterally then they could still perform work as a information clerk or visual inspector (R. 282).

### 5.     The ALJ's Decision

ALJ Jones determined that Plaintiff met the requirements set forth in the Social Security Act and was insured through the date of the decision and that she had not engaged in substantial gainful activity since onset of disability (R. 20). ALJ Jones found that Plaintiff had the following impairments: left cubital tunnel syndrome, left rotator cuff tear, mild right shoulder tendinitis, bilateral wrist pain and a chronic myofascial pain syndrome (R. 18). ALJ Jones found that Plaintiff had a combination of impairments that were severe as defined by 20 C.F.R 404.1520(b), but found that none of Plaintiff's impairments met or equaled a listed impairment in Appendix 1, Subpart P, Part 404 of the Regulations (R. 20).

ALJ Jones did not consider Plaintiff's allegations concerning her inability to sustain work activity due to constant fatigue and stinging pain and numbness in her fingers credible because he found such to be "inconsistent with the objective medical evidence, the lack of more aggressive medical treatment and the claimant's ordinary activities including "caring for her personal needs, performing household chores, cooking, driving, shopping, going for walks, visiting friends and family members, reading and watching television....." (R. 18-19).

ALJ Jones found Plaintiff to have a Residual Functional Capacity (RFC) to: perform light work with the following exertional limitations: lifting no more than five pounds frequently and ten pounds occasionally with the dominant left arm, only occasional (up to 33%) forward reaching with

left arm, no overhead reaching with left arm, only occasional gross or fine manipulation with the left hand, no forceful or sustained gripping or grasping, no constant repetitive wrist movements and no use of vibrating hand tools (R. 18, 21).

Based on this RFC and the VE's advice, the ALJ found Plaintiff unable to perform her past work (R. 21). ALJ Jones also determined that Plaintiff had no transferrable skills from her past employment (*Id*.).

Yet, using the Medical-Vocational Rules as a framework for decision making and considering the VE's testimony regarding the number of jobs available, ALJ Jones found that there were a significant number of jobs in the national economy that Plaintiff could perform and she was, therefore, not disabled (R. 21).

**II.    Analysis**

    **A.    Standards of Review**

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of

proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[1] A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.     Factual Analysis

Plaintiff argues that the Commissioner a) failed to consider properly the opinion of Plaintiff's treating physician Dr. Iwanow and b) erred in finding her testimony not credible.

#### 1.     *Dr. Iwanow's Opinion*

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. The case law in this circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability was binding on the Social Security Administration as a matter of law.[2] The administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Sec. of HHS*, 823 F.2d

---

[1] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

[2] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

922, 927 (6th Cir. 1987). Yet, this law has been slightly modified by administrative regulation which gives the Commissioner broader discretion to reject certain treating physician opinions.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits. 20 C.F.R. §404.1527 [SSI § 416.927]. While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are more strict than those established by the Sixth Circuit. The 1991 regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.

Under the 1991 regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also*, S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record. Those five criteria are:

> (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
> (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
> (3) the consistency of the opinion with the record as a whole;
> (4) specialty, with greater weight given to relevant specialists;

12

>     (5) and other factors which tend to support or contradict the opinion.

*Wallace v. Comm'r. of Soc. Sec.*, 367 F.Supp.2d 1123, 1133 (E.D. Mich. 2005).

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion to "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 404.1527(d)(2), [SSI § 916.927(d)(2)].  Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer or provide special significance to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work.  Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In 20 C.F.R. 404.1513(b) & (c) [SSI § 416.913 (b) & (c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity" (RFC).  The former is a physician's opinion on either physical or psychological capacities for work related activities.  When based on the medical source's records, clinical and laboratory findings, and examinations it can be considered a "medical opinion" under §404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion."  Yet, because these medical opinions are

different from the formal findings under §404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" -- which are subjects reserved to the Commissioner and which may be based on additional evidence in the record -- the Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §404.1527(d)(2) [§416.927(d)(2)], i.e. the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

In the present case, the portion of Dr. Iwanow's opinion to which the ALJ was required to defer or at least treat with special significance was his diagnosis of left cubital tunnel syndrome, right rotator cuff tendinitis, left rotator cuff tear, right shoulder tendinitis, myofascial pain syndrome and bilateral wrist pain - a diagnosis which was apparently undisputed and which was relied upon by the ALJ in determining Plaintiff's RFC (R. 18). Further, Dr. Iwanow's opinion that Plaintiff "could not perform repetitive or sustained gripping or holding, elbow flexion greater than 90 degrees, lifting more than 10 to 15 pounds, or return to her prior job, but could perform typing activities within her pain limits and tolerances" (R. 225) was a medical judgment about the nature and severity of Plaintiff's impairments and the ALJ, therefore, should have relied on such when determining Plaintiff's RFC. And, indeed, the RFC appears to be in line with Dr. Iwanow's suggested restrictions: lifting and carrying five pounds frequently and ten pounds occasionally with left arm, only occasionally reaching forward with left arm, no overhead reaching with left arm, only occasional gross and fine manipulation with left hand, no forceful or sustained gripping or grasping, no constant repetitive wrist movements an use of vibrating hand tools (R. 18).

Yet, Plaintiff argues that the ALJ was also required to give deferential weight to Dr.

14

Iwanow's recommendation that she be considered permanently disabled and unemployable, but this is a subject that is left to the discretion of the Commissioner. 20 C.F.R.§ 404.1527(e)(1); *Workman v. Comm'r of Soc. Sec.*, 105 Fed. Appx. 794, 800 (6th Cir., 2004)(A treating physician's conclusory statement that a claimant is disabled is not controlling because the ultimate determination of whether a claimant is disabled rests with the Commissioner.); *Wallace, supra*, 367 F.Supp.2d at 1133. Therefore ALJ Jones did properly consider Dr. Iwanow's medical opinion in making his disability determination.

Plaintiff also briefly takes issue with the fact that ALJ Jones did not discuss or evaluate her family doctor's, May 2, 2002, form letter, in which he opines that Plaintiff was capable of 65 percent "of his/her maximum capacity for sitting, standing, walking, lifting, carrying, handling objects, speaking and traveling" (Plaintiff's Brief, p.10). Yet, due to the fact that a) Dr. Karunakaran was not Plaintiff's treating physician for the impairments for which she is seeking DIB, b) ALJ Jones did properly consider Plaintiff's treating physician's opinion in determining that she is not disabled, c) the form letter was clearly generic and inconsistent with medical evidence as a whole, especially given that Plaintiff has not even alleged that she has the sitting, standing, walking or speaking impairments/limitations that he has listed and d) the opinion provided by Dr. Karnunakaran was given following a gynecological examination of Plaintiff and Plaintiff's impairments are not gynecological in nature, it cannot be said that ALJ Jones erred if he failed to give Dr. Karunakaran's opinion deferential weight. *Wallace, supra*, 367 F.Supp.2d at 1133 (discussing the five criteria for evaluating a medical opinion in conjunction with the other medical evidence of record). Further, although ALJ Jones probably should have included a reference to the opinion in his decision, the failure to do so was harmless error, in that the inclusion of the opinion would not have changed the

15

outcome for the reasons stated above. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir., 2001).

### 2. *Plaintiff's Credibility Determination*

Plaintiff takes issue with the ALJ's finding that her testimony was not credible. The standard for an administrative law judge's credibility finding is as follows:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p

Further, given that the ALJ was privy to Plaintiff's in-person testimony, this Court is limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record. *Jones v. Comm'r Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

ALJ Jones determined that Plaintiff's:

> allegations that she can perform no sustained work activity because of constant fatigue, stinging pain and numbness in her fingers that is

16

> worse with any repetitive hand use and prevents her from using her hands, and interfere [sic] with her ability to sleep and remember things are not fully credible. They are inconsistent with the objective medical evidence, the absence of more aggressive treatment and the claimant's ordinary activities which includes caring for her personal needs, performing household chores, cooking, driving, shopping, going for walks, visiting friends and family members, reading, and watching television...and she recently traveled to Florida to visit with family....

(R. 18-19).

In her brief Plaintiff argues that the ALJ specifically erred in failing to properly evaluate her testimony regarding the fact that her medication makes her dizzy and/or drowsy pursuant to 20 C.F.R §404.1529(c) (Plaintiff's Brief, p. 10). The testimony on which Plaintiff relies was given in response to Plaintiff's counsel query whether her medications had "any side effects you're aware of," to which Plaintiff replied, "[t]he Neurontin that I take–Dr. Raquest [phonetic] said it was a good idea if I take them at night because it makes you dizzy .... and drowsy...." (R. 267). It appears from this testimony that Plaintiff was speaking in general terms about the side effects of Neurontin and not referring to side effects she had necessarily experienced herself. Plaintiff also testified that she tried not to nap during the day because it caused her neck pain and headaches (R. 270) but later testified that she laid down for two 15-20 minute naps each day (R. 271). In Plaintiff's *Social Security Application* she indicated "dizziness" as a side effect of Neurontin, but not drowsiness (R. 83), and in her *Daily Activity Sheets* she recorded only one 40-minute nap in three days (R. 78-80). Plaintiff's medical records do not indicate any complaints of insomnia, dizziness, lightheadedness or drowsiness or recommendations from her treating physician that she take naps during the daytime. Therefore, it appears that ALJ Jones' explanation for discrediting Plaintiff's testimony that she is required to take two daily naps was reasonable and supported by substantial evidence in the record.

In her Brief Plaintiff also argues that the ALJ placed too much weight on her ability to carry out her personal needs and ordinary daily activities in assessing her credibility, without considering her testimony regarding the fact that she completes these activities only with assistance and/or with pain (Plaintiff's Brief, pp. 10-11). In support of her argument Plaintiff relies upon *Walston v. Gardner* (381 F.2d 580 (6th Cir. 1967)). In *Walston*, the Sixth Circuit held that a claimant "need not be bedridden or completely helpless in order to fall within the definition of 'disability.'" *Walston*, 381 F.2d at 585. Yet, *Walston* does not preclude an ALJ from evaluating a claimant's daily activities in light of her subjective complaints of pain and limitations, and the Sixth Circuit has said that an ALJ could "properly determine that [ones] subjective complaints were not credible in light of [their] ability to perform other tasks." *Heston, supra,* 245 F.3d at 536.

In Plaintiff's *Daily Activity Sheet* she indicated that she performed light housework, drove her car, cooked meals, loaded and unloaded the dishwasher, and managed her own personal care (R. 78-80). In her *Claimant Activities Questionnaire* she indicated that her impairments did not interfere with her ability to walk or climb stairs (R. 81), that she went grocery shopping (but that her husband had to push the cart when it was half full) and that she cooked (but that her husband "sometimes" helped with cooking and vacuuming), washed dishes and did laundry (R. 82).

During the hearing Plaintiff testified that she had difficulty handling the cart during grocery shopping and lifting the "canned goods or milks and stuff" (R. 268) and that her husband helped out a lot with the housework (R. 269). Plaintiff also explained that she had difficulty using her hands and that she dropped things a lot and had trouble peeling vegetables, cutting food or holding a pencil for a long time (R. 271-272).

ALJ Jones felt that this level of daily activity was inconsistent with Plaintiff's allegations

18

that she could "perform no sustained work activity." In making his credibility determination he also stated reliance upon the objective medical evidence, the absence of more aggressive treatment, Plaintiff's ability to visit friends and family members, read, watch television and travel to Florida. In sum, ALJ Jones met his burden for finding Plaintiff's testimony in support of complete disability not fully credible, in that he articulated specific reasons in his decision which were reasonably supported by substantial evidence in the case record. It is not sufficient that there is evidence in the record to support a contrary decision. *Gooch v. Sec. of Health & Human Services*, 833 F.2d 589, 592 (6th Cir.,1987). This Court must determine whether the ALJ's decision is supported by "[m]ore than a mere scintilla" of evidence (*Richardson, supra*, 402 U.S. at 401), because the ALJ's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion (*Mullen, supra*, 800 F.2d at 545). Therefore, the ALJ's determination must be upheld.

### III.     Recommendation

For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be GRANTED and Plaintiff's Motion for Summary Judgment be DENIED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health*

*and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: August 26, 2005
Ann Arbor, Michigan

s/Steven D. Pepe
United States Magistrate Judge

Certificate of Service

I hereby certify that copies of this Order were served upon the attorneys of record by electronic means or U. S. Mail on August 26, 2005.

s/William J. Barkholz
Courtroom Deputy Clerk